IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


QUINN RAY BARTON,
      Petitioner,

vs.                          Case No.:  3:15cv397/MCR/EMT

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 23, 24-1).  Petitioner filed a reply (ECF No. 33).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

        The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 24-1).[1]  Petitioner was charged in the Circuit Court in and for Walton County, Florida, Case No. 2013-CF-383, with one count of sale, manufacture, or deliver, or possess with intent to sell, manufacture, or deliver, a controlled substance (marijuana and/or cannabis) (Count 1), one count of possession of a controlled substance (more than 20 grams of cannabis) (Count 2), and one count of possession of drug paraphernalia (Count 3) (Ex. A at 32).  Following a jury trial, Petitioner was found not guilty on Count 1, and guilty as charged on Counts 2 and 3 (Ex. A at 97, Ex. D).  On May 20, 2014, the court sentenced Petitioner to a suspended sentence of twenty-four (24) months in prison, and placed him on probation for a period of three (3) years (with the first year on community control) as to Count 2, and a concurrent term of six months probation on Count 3 (Ex. F at 167–70).

_____

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 24-1).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D14-2518 (Exs. G, H).  The First DCA affirmed the judgment per curiam without written opinion on May 4, 2015, with the mandate issuing May 20, 2015.  Barton v. State, 162 So. 3d 986 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on August 25, 2015 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the <u>Williams</u> framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. <u>Thaler v. Haynes</u>, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L.

Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation

omitted)).  If the state court decision is contrary to clearly established federal law, the

federal habeas court must independently consider the merits of the petitioner's claim.

*See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662

(2007).

If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the state

court's reasoning unless the state court's application of the legal principle(s) was

"objectively unreasonable" in light of the record before the state court.  Williams, 529

U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has

emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning their
> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."   Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1).  The petitioner bears "the burden of rebutting the presumption of correctness by clear

and convincing evidence." *Id.*; *see, e.g.*, <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  <u>Gill</u>, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claim.

## III.    PETITIONER'S CLAIM

<u>Ground One: "Petitioner's Fifth, Sixth, Fourth, and Fourteenth Amendment rights of the United States Constitution were violated when the Petitioner was wrongfully convicted of said charges."</u>

Petitioner contends he was convicted based upon evidence obtained from an illegal entry and search of his property, in violation of the Fourth Amendment (ECF No. 1 at 4–16). He asserts he presented his Fourth Amendment claim to the trial court and on direct appeal (*id.*).

Respondent contends the habeas petition should be dismissed, because the Supreme Court determined, in <u>Stone v. Powell</u>, 428 U.S. 465 (1976), that Fourth Amendment claims are not cognizable in federal habeas (ECF No. 23 at 5–8). Respondent additionally contends that even if the court considered Petitioner's Fourth Amendment claim on the merits, he is not entitled to habeas relief (*id.* at 10–20).

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

was introduced at his trial." <u>Stone v. Powell</u>, 428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). The Eleventh Circuit has interpreted the phrase "opportunity for full and fair litigation" to "mean[ ] just that: an opportunity.'" <u>Lawhorn v. Allen</u>, 519 F.3d 1272, 1287 (11th Cir. 2008) (quoting <u>Caver v. Alabama</u>, 577 F.2d 1188, 1192 (5th Cir. 1978)). In <u>Caver</u>, the court explained that "if state procedures afford the defendant in a criminal case the opportunity to litigate whether evidence obtained in violation of the fourth amendment should be excluded, and if that opportunity to litigate fourth amendment issues is 'full and fair[,]' . . . then <u>Stone v. Powell</u> precludes federal habeas corpus consideration of those issues whether or not the defendant avails himself of that opportunity." 577 F.2d at 1193.

A state does not afford a defendant a full and fair opportunity to litigate the validity of a search under the Fourth Amendment when the state courts fail to make essential findings of fact. In <u>Tukes v. Dugger</u>, the Eleventh Circuit addressed whether <u>Stone</u> foreclosed review of the validity of a search when the defendant presented his argument, but the state courts failed to make findings of fact to resolve that argument. 911 F.2d 508, 513–14 (11th Cir. 1990). The Eleventh Circuit concluded that the state courts had failed to afford the defendant a full and fair opportunity to litigate the validity of the search when they did not make findings of fact about whether the

defendant had invoked his right to counsel or was in custody when he consented to the search of his home. The court stated, "The trial court's failure to make explicit findings on matters essential to the fourth amendment issue, combined with the fact that the state appellate court issued only a summary affirmance, precludes a conclusion in this case that the state provided the meaningful appellate review necessary to erect a Stone v. Powell bar to our review of the claim." *Id.* at 514; *see also, e.g.*, Hearn v. Florida, 326 F. App'x 519, (11th Cir. 2009) (unpublished but recognized as persuasive authority) (state trial court's summary denial of defendant's motion to suppress, coupled with a summary affirmance by state appellate court, was insufficient to deny defendant consideration of the merits of his constitutional suppression claim on federal habeas corpus review; neither the trial court nor the appellate court made any findings of fact on matters essential to defendant's Fourth Amendment argument).

In Petitioner's case, Petitioner presented the Fourth Amendment issue to the state trial court in a motion to suppress (Ex. A at 57–64). The trial court held an evidentiary hearing on Petitioner's motion to suppress on February 4, 2014 (Ex. B). The following evidence was adduced at the hearing.

Deputy Nick Bearden testified he was a member of the K-9 Unit of the Walton County Sheriff's Office on June 12, 2013 (Ex. B at 4–10).  He testified that on that date, he was notified by Sergeant Allen Godwin, an officer with the Florida Department of Corrections ("FDOC"), that officers had discovered marijuana plants during a training exercise conducted on Cat Island Road near Cat Island Spray Field. Bearden testified that he arrived at the scene, and the FDOC officers advised him that they found marijuana plants in the woods north of the spray field, and east of a house, and that it appeared that someone had recently left the area.  Deputy Bearden testified that he obtained approval to start tracking with canines, and they began tracking. Bearden testified that the canines tracked several hundred yards from the marijuana plants in the woods to a "pasture fence."  Deputy Bearden described the fence as a wire fence, with four to five-inch square holes.  He testified that the fence did not have barbed wire.  Bearden testified that upon arrival at the fence, he could see where footprints "transmitted" across the fence and appeared on a plowed area on the house-side of the fence.  Deputy Bearden testified that some footprints were observed near the marijuana plants found in the woods, and some footprints were observed throughout the woods during the track. Deputy Bearden described the property inside the fence as follows:

> It was kind of open.  It was probably maybe four to five acres maybe fenced in.  The house kind of set in the middle of the property.  Approximately 30 to 40 yards to the southeast there was like a greenhouse or a shed type thing.  And on the east of the shed there was like a little garden type thing that was built up off the ground.

(Ex. B at 7).  Deputy Bearden testified that the canines tracked from left to right along the non-residence side of the fence.  Bearden testified that once the canines came upon the raised garden box, he could see footprints on the residence-side of the fence.  Bearden testified that as they were starting to move the dogs across the fence, another officer reported that he saw marijuana plants in the raised garden box, so they stopped the canine tracking.  Bearden testified that the raised garden box was fifteen to thirty yards from the fence on the residence-side, and thirty to forty yards from the residence (*id.* at 8, 16, 20).  Bearden testified that the plants were not concealed or covered-up from view.  Bearden testified that the plants were visible from inside the yard, and once he knew they were there, he could see them from outside the yard.  Deputy Bearden testified that upon discovering the marijuana plants, a Sheriff's Office investigator was notified, and officers secured the area and remained on the scene until a marked unit arrived.  Deputy Bearden testified that he did not recall seeing any posted signs that would suggest the area was intended to be concealed from the view of other people.  He testified there were no privacy fences or vegetation concealing

the view.  Bearden testified that once the officers discovered the raised garden box containing the plants, they stopped (*id.* at 21).

On cross-examination, Deputy Bearden testified that the marijuana plants discovered in the raised garden box were two plants approximately six inches or smaller (Ex. B at 11–19).  Bearden testified that he did not observe the marijuana plants from outside the fenced area.  He testified that a person had to be fairly close to the plants to identify them as marijuana plants.  Bearden testified that he did not recall seeing any items between the residence and the greenhouse/shed, for example cars or tools, that suggested it was a "commonly used area" (*id.* at 17).  Deputy Bearden testified that the canines were trained to track humans, not drugs.  With regard to the shoe prints discovered in the field, Bearden testified that they were not whole prints.  He testified that all that was visible was the heel of a large boot-type shoe.  Bearden testified that the same print was in the yard.

On re-direct examination, Deputy Bearden testified that he was familiar with marijuana plants and had seen them at varying stages of growth (Ex. B at 20).  He testified that he was able to identify different ages of marijuana plants, including small ones.

Dexter Early testified he was employed with the FDOC as a supervisor of the canine unit of Okaloosa Correctional Institution (Ex. B at 22–30).  He testified that the canines are trained to track human scent, but they are not trained to detect drugs. Early testified on June 12, 2013, the canine unit was assisting officers from Walton Correctional Institution in an escape training exercise.  He testified that they were conducting the exercise at the spray field.  Early testified that he was the "third leg" of the track, which was trailing two officers who were "put on the ground" earlier as part of the exercise.  Early testified that when he put his canines "on the ground," they picked up a track and were running to the east on the north edge of the spray field. Early testified that when they arrived at the corner of the property, the spray field turned south a short distance, and the canines trailed into the woods.  Early testified that the sergeant who was accompanying him advised him that the officers they were tracking did not go there (into the woods), so Early pulled his canine back and they went around the corner of the field and went down the north side of the spray field again.  Early testified that the dogs again began tracking through the woods.  He testified, "they were running a man, running a man a lot" (Ex. B at 24).  Early testified that he and the sergeant went with the dogs and came to marijuana plants in the woods, so they called their supervisor, halted the exercise, and notified Deputy

Bearden.  Early testified that once Bearden arrived, they went back to the marijuana

plants in the woods.  He continued:

> We cut around the area and picked up two tracks and then we trailed it
> back to the spray field where the dogs had tried to go in the woods the
> first time.  From there the two—we had trailed that already.  So rather
> than going right back down that track, we cut just to the north of the
> woods all the way down to the northwest corner of the spray field. Didn't
> pick up any tracks in the woods there.  We come back in the spray field
> and picked up the same two shoe tracks that we had run earlier and it
> went through the little strip of woods there to the edge of the private
> property.

(Ex. B at 24).  Early testified that the distance from the marijuana plants in the woods

to the edge of the private property was approximately a quarter of a mile.  Early

testified that when they arrived at the fence, they trailed down the side of the fence

approximately 100 yards.  He testified they came back out toward the spray field on

a thin trail, and there were eighteen marijuana plants in pots.  Early testified that they

then tracked back to the corner of the fence located between the spray field and the

residence.  Early testified that he confirmed a trail up to the fence, and it was evident

that a person had climbed the fence, because there was wet sand on the dew on the

fence and shoe prints on the other side of the fence.  He testified they went over the

fence and put the canines back on the ground, and the dogs tracked through part of the

yard where there were bee hives.  Early testified that they came upon a small box with

potting soil in it and two marijuana plants.  Early testified that the plants were twenty-five to thirty yards from the residence (*id.* at 27).  He testified that upon locating the marijuana plants in the box, they took the canines back across the fence, and Sergeant Bearden took over.  Early testified that they "didn't quite get to the greenhouse" (*id.* at 32).  He testified that once they went back across the fence, he could see the marijuana plants in plain view, but when he first saw them from that view he did not know that they were marijuana plants.  Early described the property as being a "pretty good size," with a hog wire fence on the backside and south side.  He testified that there were no trees, shrubbery, or anything else indicating that anyone attempted to make the area more private.  Early testified that the only thing he saw between the fence and the raised garden box were bee hives, which were on the "backside" of the property (*id.* at 25, 28, 32).

Early testified that the two canines they were using were experienced (Ex. B at 28–29).  Early testified that he logged thousands of hours with those two canines.  He testified he kept logs of how successful the two canines were at tracking, and that their success rate during practices was ninety-nine percent.  He testified that based upon his experience and working with those two particular canines, they were on a "hot trail"

that led to the fence.  On cross-examination, Early testified that the canines were not

trained to track marijuana, only human scent (*id.* at 30).  He testified:

> Q [by defense counsel].  All right.  Prior to going to the—discovering the marijuana plants, did you ever walk up closer to the—residence?
>
> A.  No.
>
> Q.  Excuse me.  You never got closer to the main residence?
>
> A.  No.
>
> Q.  So you were somewhere—were you in between the main residence and the greenhouse when you discovered the marijuana plants in a straight line, so to speak?
>
> A.  No.  The greenhouse would have been—okay, say if we were traveling north—basically northwest, the greenhouse would have been to the west and the residence would have been north, maybe a hair north, northwest.
>
> Q.  So from a straight line standpoint, how far from the greenhouse to the residence?
>
> A.  It probably would have been pretty close to the same distance because it was just on the other side of where we stopped.
>
> Q.  20 feet?
>
> A.  No, it was further than that.
>
> Q.  30 feet?
>
> A.  Probably 20 to 25 yards.

Q.  So the marijuana plants were 20 to 25 yards from the main residence?

A.  Probably.  I didn't measure it.  It's been, what, six months?  25 or 30 yards I would say just what I remember from the marijuana plants to the house.

Q.  So it could have been closer, it could have been farther?

A.  Right.

Q.  Sitting here today you have no idea?

A.  I didn't measure it, no, sir.

Q.  Okay.  And were you the first person to discover these plants?

A.  Yes, I was.

. . . .

Q.  So you were right up at the corner of the bed when you saw them?

A.  Right.  I mean, I could have reached out and touched it when I saw what it was.

Q.  Okay.

A.  Because the dogs had trailed right around the corner of it. That's when I stopped them.

(Ex. B at 32–35).  Early testified that the only place he saw shoe prints was when they first came over the fence (*id.* at 36).  He testified that the shoe prints did not actually

lead up to the raised garden box, but the canines trailed from the shoe print at the

fence to the box (*id.*).

Petitioner voluntarily testified at the suppression hearing (Ex. B at 37–43).  He

identified Defense Exhibit 1 as a photograph of the raised garden box, and Defense

Exhibits 2 through 6 as photographs of his property.  The photographs are part of the

state court record (Ex. F at 160–65).  Petitioner testified that on the side of the fence

that the officers crossed, there were two strands of barbed wire (Ex. B at 39–43).  He

testified that the "hog wire" is on top of the barbed wire.  Petitioner testified that the

barbed wire was not represented in the photographs, because the photographs were

"field" pictures.  Petitioner testified that there were also "no trespassing" signs in his

yard on the day the officers were there, but on cross-examination, he admitted that the

"no trespassing" signs, shown in Defense Exhibits 2, 3, 4, and 5, were at the front

entry of the property, and there were no signs at the back of the property.  Petitioner

testified that his property was fully enclosed with a fence.  He testified that the

distance between his residence and the greenhouse/shed was seventy-five feet.  He

testified that there were peach trees, cement mixers, and building materials between

his house and the greenhouse/shed.  He testified that he regularly worked in the area

between his house and the shed.  Petitioner testified that the raised garden box was ten feet from the shed, and seventy-four feet from the house.

The issue presented to the trial court was whether the officers were in the curtilage of Petitioner's home when they observed the marijuana plants in the raised garden box (Ex. B at 43–49).  The parties agreed that United States v. Dunn, 480 U.S. 294, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987) and Oliver v. United States, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984) were the relevant Supreme Court cases applicable to the Fourth Amendment issue.  Defense counsel argued the officers were in the curtilage of Petitioner's home, because they were in the area between the home and the greenhouse/shed, which was commonly used as incident to the home, as indicated by the bee hives, peach trees, and cement mixer.  The prosecutor argued that the officers were not in an area associated with the intimate activities of the home. The trial court advised the parties that it would take the matter under advisement and review Dunn (Ex. B at 48–49).  Two days later, on February 6, 2014, the court announced, "The Court is going to deny your . . . Motion to Suppress" (Ex. C at 2).

Petitioner presented his Fourth Amendment claim on direct appeal (Ex. H).  He argued that under the totality of the circumstances and the four-factor test set forth in Dunn, *supra*, the raised garden box was in the curtilage of Petitioner's home;

therefore, Fourth Amendment protections applied to that area.  Petitioner argued that the officers' warrantless entry into and search of Petitioner's backyard, and the ensuing seizure of the two plants in the raised garden box, was unlawful.  Petitioner conceded that the entire 5-acre property was not curtilage (*see* Ex. H at 24), thus admitting that some of the area within the fenced 5 acres was open field and some was curtilage.  But he argued that the officers had entered the curtilage when they observed the marijuana plants.

The State argued that under the open fields doctrine, law enforcement could legally cross the boundary fence and cross Petitioner's yard until they reached the part of the yard which was curtilage (Ex. I).  The State contended that a large portion of Petitioner's yard was not curtilage, but open field.  The State argued that observations made by law enforcement from an open field are not considered searches, and anything Petitioner kept in open view could be legally observed, even if the thing being observed was in a constitutionally protected place.  The State argued that the officers only crossed the portion of Petitioner's yard that was open field, and from there they observed the marijuana.

The First DCA affirmed, without written explanation, the trial court's ruling on the Fourth Amendment issue.  Barton v. State, 162 So. 3d 986 (Fla. 1st DCA 2015) (Table).

The court will first address Respondent's argument that Stone v. Powell precludes this court from considering Petitioner's Fourth Amendment claim. Although the trial court implicitly found that the officers were not within the curtilage of Petitioner's home when they observed the marijuana plants in the raised garden box, the trial court's failure to make explicit findings on the issue, combined with the fact that the First DCA issued only a summary affirmance, appears to preclude a conclusion that the state provided the meaningful appellate review necessary to erect a Stone v. Powell bar to federal habeas review of the Fourth Amendment claim.  *See* Tukes, 911 F.2d at 514.  Therefore, the court will review the First DCA's rejection of Petitioner's Fourth Amendment claim to determine whether it is contrary to or an unreasonable application of clearly established federal law, pursuant to § 2254(d).

A.    Clearly Established Federal Law

The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself; however, the concept plays a part in

interpreting the reach of the Fourth Amendment.  *See* <u>Dunn</u>, 480 U.S. at 300.  In

<u>Oliver v. United States</u>, the Court recognized that the Fourth Amendment protects the

curtilage of a house, and the extent of the curtilage is determined by factors that bear

upon whether an individual reasonably may expect that the area in question should be

treated as the home itself.  466 U.S. 170, 178, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214

(1984) (reaffirming the holding of <u>Hester v. United States</u>, 265 U.S. 57, 59, 44 S. Ct.

445, 68 L. Ed. 898 (1924), that "an individual may not legitimately demand privacy

for activities conducted out of doors in field, except in the area immediately

surrounding the home.").  The Court identified the central component of this inquiry

as whether the area harbors the "intimate activity associated with the 'sanctity of a

man's home and the privacies of life.'" *Id.* (quoting <u>Boyd v. United States</u>, 116 U.S.

616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746 (1886)).

In <u>Dunn</u>, the Court held that curtilage questions should be resolved with

particular reference to four factors:  the proximity of the area claimed to be curtilage

to the home, whether the area is included within an enclosure surrounding the home,

the nature of the uses to which the area is put, and the steps taken by the resident to

protect the area from observation by people passing by.  480 U.S. at 301 (citations

omitted).  The <u>Dunn</u> Court did not suggest that combining these factors produces a

finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions.  *Id.*  Rather, the Court stated that these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.  *Id.*

Additionally, the <u>Dunn</u> Court declined the Government's invitation to adopt a bright-line rule that the curtilage should extend no farther than the nearest fence surrounding a fenced house.  480 U.S. at 301 n.4.  The Court opined that fencing configurations are important factors in defining the curtilage, but the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home.  *Id.*  The Court noted that application of the Government's "first fence rule" might well lead to diminished Fourth Amendment protection in those cases where a structure lying outside a home's enclosing fence was used for such domestic activities.  *Id.*  The Court further noted that, in those cases where a house is situated on a large parcel of property and has no nearby enclosing fence, the Government's rule would serve no utility; a court would still be required to assess the various factors outlined above to define the extent of the curtilage.  *Id.*

Applying the four factors, the Court in <u>Dunn</u> held that law enforcement officers did not violate the Fourth Amendment when they crossed Dunn's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of a barn and peering into its open front door. 480 U.S. at 304. The Court held that the officers were in the open fields outside the curtilage of Dunn's house, and thus were not constitutionally forbidden to observe the illegal chemical lab located in Dunn's barn. *Id.*

The defendant bears the burden of proof in proving that he or she had a legitimate expectation of privacy in the area searched, and that an officer's actions constitute an unreasonable search within the meaning of the Fourth Amendment. *See* <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *see also* <u>Florida v. Riley</u>, 488 U.S. 445, 455, 109 S. Ct. 693, 102 L. Ed. 2d 835 (1989) (O'Connor, J., concurring) ("In my view, the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a 'search' within the meaning of the Fourth Amendment even took place.").

B.    <u>Federal Review of State Court Decision</u>

The relevant decision for purposes of 28 U.S.C. § 2254 is the First DCA's summary affirmance, which is the final state court adjudication on the merits of

Petitioner's Fourth Amendment claim. Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1235 (11th Cir. 2016) (defining the relevant decision for purposes of § 2254 review as the state appellate court's summary affirmance of the lower tribunal's decision), *petition for cert. filed*, No. 16-6855 (U.S. Nov. 15, 2016). Where, as here, "the last adjudication on the merits provides no reasoned opinion, federal courts review that decision using the test announced in Richter." Wilson at 1235. The Richter test provides that "[w]here a state court's decision is unaccompanied by an explanation," a petitioner's burden under section 2254(d) is to "show[ ] there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court." *Id.* at 102.

In reviewing the reasonableness of the First DCA's decision, this court may, but is not required to, look to the reasoning of the state court below (the trial court). The Eleventh Circuit explained in Wilson:

> When the reasoning of the state trial court was reasonable, there is necessarily at least one reasonable basis on which the state [appellate] court could have denied relief and our inquiry ends. In this way, federal courts can use previous opinions as evidence that the relevant state court

> decision under review is reasonable. But the relevant state court decision
> for federal habeas review remains the last adjudication on the merits, and
> federal courts are not limited to assessing the reasoning of the lower
> court.

834 F.3d at 1239.

Determining whether a particular area is in an open field or curtilage is a question of fact. *See* United States v. Berrong, 712 F.2d 1370, 1374 (11th Cir. 1983) (citation omitted). Here, the trial court implicitly found that the officers were in the open fields and not in the curtilage of Petitioner's home when they observed the marijuana plants in the raised garden box. Though an implicit factual finding may not be sufficient to support a Stone v. Powell bar to consideration of Petitioner's Fourth Amendment claim,[2] it is sufficient to invoke the deference afforded to factual findings under § 2254(d) and (e)(1). *See* Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1213 (11th Cir. 2013) (federal habeas court must afford AEDPA deference even where state court's decision is a summary adjudication or engages in only some evaluation, because "implicit findings" may be inferred from dispositive rulings)[3];

---

[2] Stone appears to require explicit factual findings on the Fourth Amendment issue.

[3] In Lee, the Eleventh Circuit contrasted (a) a state court's not explicitly addressing a claim or argument made by a petitioner and the federal court's inferring findings from that state court's decision to (b) a wholly different type of case where the state court's opinion itself makes clear that it considered one claim but expressly decided not to reach or rule on another claim. 726 F.3d at 1213 n.24. The Eleventh Circuit clarified that if a state court opinion expressly tells the federal court that it is not ruling on an issue, then there is no ruling to which the federal court can defer. *Id.*

Greene v. Upton, 644 F.3d 1145, 1155–56 (11th Cir. 2011) (emphasizing in a § 2254 capital case that "Batson does not require elaborate factual findings" and applying AEDPA deference to a state court's Batson ruling even though it did not address every argument or make an explicit fact finding on Batson's third step); Dasher v. Attorney Gen., Fla., 574 F.3d 1310, 1314 (11th Cir. 2009) (state court's decision denying petitioner's claim, that he was deprived of effective assistance of counsel because of counsel's alleged failure to adequately investigate his criminal record before advising him of his sentence exposure, was not based on an unreasonable determination of the facts where testimony at the state post-conviction hearing supported an implicit finding that petitioner failed to disclose his criminal record to counsel); Blankenship v. Hall, 542 F.3d 1253, 1271–72 (11th Cir. 2008) ("implicit findings" may be inferred from a state court opinion and record, and "these implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact"); Hightower v. Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) (deferring to a state court judgment on a Batson claim in a § 2254 capital case and noting a state court's "dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling").

_____

(citation omitted).

Case No.:  3:15cv397/MCR/EMT

Having concluded that the state court's rejection of Petitioner's Fourth Amendment claim was based upon the implicit factual finding that the officers were in the open fields outside the curtilage of Petitioner's home when they observed the marijuana plants in the raised garden box, the court must determine whether Petitioner has shown, by clear and convincing evidence, that this factual finding is unreasonable in light of the evidence presented at the suppression hearing.

The undersigned concludes that Petitioner has failed to satisfy this burden. Some of the evidence adduced at the suppression hearing weighed in Petitioner's favor as to the Dunn factors—for example, the proximity of the raised garden box to Petitioner's home (approximately 25 yards),[4] and perhaps the nature of the uses to which the area was put (Petitioner testified that there were bee hives, peach trees, cement mixers, and building material in the area between the house and the raised garden box; that the raised garden box was immediately next to a greenhouse/shed;

---

[4] Cf Dunn, 480 U.S. at 302 (concluding that "substantial distance" of barn from house—barn was located 50 yards from fence surrounding house, and 60 yards from house itself— supported no inference that barn was an adjunct of the house); United States v. Taylor, 676 F.3d 1352, 1262 (11th Cir. 2012) (concluding that 50–75 yards is a "substantial distance"); United States v. Taylor, 458 F.3d 1201, 1207 (11th Cir. 2006) (concluding that pond, which was 60 yards away from the house, and separated from the house by a barn and another structure, was not within curtilage of home, since in order to lie in the curtilage, an area must be "an integral part of that group of structures making up the immediate domestic establishment of the home," ); United States v. Hatch, 931 F.2d 1478, 1481 (11th Cir. 1991) (marijuana growing 30 yards and farther from the house and separated from the house by a barn, tack room, taxidermy building and some stock pens, was sufficiently removed from the house so as to be beyond its curtilage).

and that he regularly worked in the area).[5]  However, some of the evidence weighed against Petitioner—for example, the lack of steps taken by Petitioner to protect the area from observation by people passing by.[6]  Some of the evidence weighed neutrally as to the curtilage issue—for example, whether the raised garden box was included within an enclosure surrounding the home.[7]

----

[5] *Cf* Dunn, 480 U.S. at 302–03 (finding it "especially significant" that law enforcement possessed objective data (aerial photographs, a "very strong odor" of phenylacetic acid, the "very loud" sound of a pump motor running) indicating that barn was not being used for intimate activities of the home); Taylor, 676 F.3d at 1262 (concluding that there was no indication that defendant used outbuilding for intimate activities; instead it was used to grow marijuana); Taylor, 458 F.3d at 1207 (pond was not being used in connection with any "intimate activity of the home); Hatch, 931 F.2d at 1482 (the growing of marijuana in an open field was significantly not an intimate activity of the home).

[6] *See* Dunn, 480 U.S. at 303 (Dunn did little to protect the barn area from observation by those standing in open fields surrounding it; nothing in the record suggested that the interior fences on the property had any function other than that of the "typical ranch fence," that is, to corral livestock, not to prevent persons from observing what lay inside the enclosed areas); Taylor, 458 F.3d at 1208 (pond area constituted an open field within the meaning of Oliver; the property on which Taylor's house was located consisted of approximately five acres, bordered on two sides by roads and surrounded only by a field fence through which one can see the property from the road; notwithstanding the perimeter fence, Taylor did not have a reasonable privacy interest in the entire five acres of the property; the pond area was situated well beyond the "immediate domestic establishment" of Taylor's home and was clearly visible from the perimeter fence; no steps have been taken to protect it from view; as an unoccupied and undeveloped area outside the immediate domestic establishment, Taylor had no reasonable expectation of privacy in the area and the pond was not within the curtilage of his home).

[7] There was nothing that demarked a specific area of land immediately adjacent to Petitioner's house that was readily identifiable as part and parcel of the house.  On the other hand, there was nothing demarking the raised garden box and the area immediately surrounding it, as a distinct portion of Petitioner's property separate from the house.

Case No.:  3:15cv397/MCR/EMT

Petitioner failed to demonstrate, by clear and convincing evidence, that the state court's finding, that the officers were not in the curtilage of Petitioner's residence at the time they observed the marijuana plants in the raised garden box, was unreasonable in light of the evidence presented at the suppression hearing. Additionally, Petitioner failed to demonstrate that the state court unreasonably applied Dunn, or applied a rule contrary to that Supreme Court decision.  Therefore, he is not entitled to federal habeas relief on his Fourth Amendment claim.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing)

(citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 15th day of February 2017.


                    /s/ *Elizabeth M. Timothy*
                    **ELIZABETH M.  TIMOTHY**
                    **CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.